In re JACKSON BRICK & TILE CO.

(District Court, Judicial D. Missouri, S. E. D. July 18, 1911.)

No. 21.

1. BANKRUPTCY (§ 341*)—VALIDITY OF LIENS—JURISDICTION OF REFEREE.

Where a trustee is in possession of real estate incumbered by a deed of trust, deposited as collateral security with a creditor of the bankrupt, and the creditor voluntarily appears before the referee and presents his claim for allowance as a secured claim by virtue of the deed of trust, the referee has jurisdiction to summarily determine the validity of the lien.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 341.*]

2. DEEDS (§ 208*)—DELIVERY—EVIDENCE—SUFFICIENCY.

A corporation, by its president, executed a deed to another corporation of which the same person was president, and on the same date the grantee, by its president, executed a deed of trust to secure purchase money notes. Both corporations treated the deed as delivered, and the deed of trust and the purchase money notes were pledged as collateral for a loan made to the grantor by a third person. Held to show that the deed was delivered so that title passed thereunder prior to the execution of the deed of trust.

[Ed. Note.—For other cases, see Deeds, Dec. Dig. § 208.*]

3. CORPORATIONS (§ 28*)—ORGANIZATION—DE FACTO CORPORATIONS.

Where the incorporators took the formal steps required by statute to entitle the corporation to a certificate of incorporation, and the Secretary of State issued a certificate in due form, the corporation was a de facto corporation, though it had no stockholders, and though no part of its capital stock was paid in.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 26, 70; Dec. Dig. § 28.*]

4. CORPORATIONS (§ 28*)—DE FACTO CORPORATIONS—CONVEYANCES—COLLATERAL ATTACK.

A transfer of property by or to a de facto corporation cannot be collaterally attacked, and is valid against all persons except the state.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 26, 70; Dec. Dig. § 28.*]

5. BANKRUPTCY (§ 161*)—PREFERENCES—ACTS CONSTITUTING.

Bankr. Act July 1, 1898, c. 541, § 60a, 30 Stat. 562 (U. S. Comp. St. 1901, p. 3445), as amended by Act Cong. Feb. 5, 1903, c. 487, § 13, 32 Stat. 799 (U. S. Comp. St. Supp. 1909, p. 1314), which provides that where the preference consists of a transfer, the period of four months shall not expire until four months after the record of the transfer, as required by law, extends the time within which a transfer may be attacked as a preference, and where a transfer is one which is required to be recorded, the four months' period does not begin to run until the conveyance is recorded, but where the transfer, when made, was based on a present consideration, delay in recording does not warrant the court in treating the conveyance as if made as security for an antecedent debt, and a transfer given as security for a present loan is not a voidable preference, though the transfer is not recorded until within four months of the adjudication in bankruptcy of the transferror.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 161.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

**6. BANKRUPTCY (§ 184\*)—FRAUDULENT CONVEYANCES—FAILURE TO RECORD CONVEYANCES.**

Rev. St. Mo. 1899, § 925, provides that no instrument shall be valid except between the parties and such as have actual notice, until deposited for record. Bankr. Act July 1, 1898, c. 541, §§ 67a, 67e, 70e, 30 Stat. 564, 565 (U. S. Comp. St. 1901, pp. 3449, 3451), confer on trustees the right to avoid transfers, voidable as fraudulent conveyances, or which may be avoided by creditors under the state law for want of record. A grantor, a corporation, conveyed its land to a grantee, a corporation, which on the same day executed a deed of trust to secure the purchase money notes. The grantor borrowed money from a bank and pledged as collateral the notes and deed of trust. Neither of the deeds were then recorded, but the bank later returned the deed of trust to the president of the grantor with instructions to record it, which was not done for nearly five years, and until within four months of the adjudication of the bankruptcy of the grantor. Before the record of the deed the grantor incurred debts to persons who relied on its ownership of the property. [Held, that the deed of trust was constructively fraudulent as to creditors extending credit to the bankrupt, and the lien of the bank must be treated as invalid as against the trustee as a representative of the creditors.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 184.\*]

In the matter of the bankruptcy proceedings against the Jackson Brick & Tile Company. Proceeding for review of an order of the referee in bankruptcy, allowing the claim of the Sturdivant Bank as an unsecured claim, and denying claimant's prayer for the allowance of its claim as a secured claim. Affirmed.

Oliver & Oliver, for Sturdivant Bank.
Fordyce-Holliday & White, for Merchants-Laclede Nat. Bank.
Moses Whybark and W. D. Hines, for trustee.

DYER, District Judge. This is a proceeding for review of an order of the referee in bankruptcy, allowing the claim of the Sturdivant Bank as an unsecured claim against the bankrupt estate and denying the prayer of the claimant that its claim be allowed as a secured claim. The Sturdivant Bank presented its claim against the bankrupt in the sum of $15,410, and set forth therein that it held as security for said indebtedness 25 promissory notes, each for $500, executed by the Jackson Chemical Manufacturing Company, a corporation, and that the last-mentioned notes were secured by a deed of trust upon 117 acres of land, and also upon two lots in Cape Girardeau county, Mo. The claimant prayed that its claim be allowed as a "preferred claim" against the bankrupt, and prayed that the land described in the deed of trust "be stricken from the schedule of assets belonging to the bankrupt estate and applied to the credit of the notes," referred to in the claim. The trustee of the bankrupt estate filed written objections to the allowance of the claim as a preferred one, alleging, in substance: (1) That the claimant obtained a preference in respect of its claim by means of a judgment rendered in its favor against the bankrupt; (2) that the transfer of the land mentioned in the deed of trust from the bankrupt company to the Jackson Chemical Manufacturing Company, and the deed of trust executed by the Jackson Chemical Manufacturing Company, constituted a voidable preference

under the bankrupt law; (3) that the deed from the bankrupt to the Jackson Chemical Manufacturing Company, and the deed of trust of the latter company securing the notes held by the bank, were withheld from record by the bank for about four years, and that the withholding of said conveyances from record gave the bankrupt a fictitious credit and enabled it to procure material and labor and to borrow money on credit, and constituted a fraud in law against the creditors of the bankrupt; (4) that the "Jackson Chemical Manufacturing Company never had any legal existence, nor was a charter ever issued by the state of Missouri, or any other state, creating such corporation, and * * * if it did have such legal existence, it never had any assets or property of any kind, but was created solely for a fraudulent purpose, * * * and that said conveyance and the said incumbrance were executed with the intent to hinder, delay, and defraud the creditors of the bankrupt."

One Hugh R. Quinn, a creditor, by leave of the referee, also filed written objections to the allowance of the bank's claim, alleging, in substance: (1) That the real estate described in the deed of trust held by the bank is and always has been the property of the bankrupt company; (2) that the deed from the bankrupt company to the Jackson Chemical Manufacturing Company was never delivered and no title passed thereby; (3) that the said deed was not filed for record until within four months of the adjudication of bankruptcy; (4) that the Jackson Chemical Manufacturing Company, if incorporated in fact, had no authority under its charter to take and hold said real estate, and that the deed of trust made by the Jackson Chemical Manufacturing Company is null and void and of no effect; (5) that the deed of trust executed by the Jackson Chemical Manufacturing Company was never delivered, and no title passed thereunder; (6) that the deed of trust executed by the Jackson Chemical Manufacturing Company was not filed for record until within four months of the adjudication of bankruptcy herein and is null and void as a lien upon the estate of the bankrupt.

The referee afterwards heard the evidence submitted by the respective parties, and on March 23, 1908, made an order disallowing the claim "as a preferred or secured claim," and allowing it as a general claim in the sum of $16,275; and also made an order denying the application of the claimant to strike from the schedule of assets the land described in the deed of trust referred to in the claim. Thereafter, on April 2, 1908, the claimant, the Sturdivant Bank, filed with the referee a petition for review of the foregoing order and the referee has certified the matter to this court.

The material facts bearing upon this controversy, as they appear from the referee's summary of the evidence, are as follows:

The bankrupt company was incorporated in Missouri in April, 1897, under the name of the English Mining & Manufacturing Company, and in December, 1902, changed its name to the Jackson Brick & Tile Company. From the time of its original incorporation in 1897, until July, 1906, the bankrupt company was engaged in the business of manufacturing brick, fire brick and drain tile near Jackson, Mo., and had

a manufacturing plant and certain lands in that locality. Henry R. English was the organizer and principal stockholder of the bankrupt company and throughout its career was its president and in complete control of its affairs. On September 12, 1902, Henry R. English caused a corporation to be organized under the statutes of Missouri under the name Jackson Chemical Manufacturing Company, said corporation purporting to have a full paid capital stock of $20,000, but the evidence tends to show that no part of this capital was ever paid in, and that Henry R. English caused the company to be incorporated for the purpose of borrowing money for the bankrupt company, and that the company never transacted any business with the exception of the transaction to be hereafter mentioned. Immediately upon the incorporation of the Jackson Chemical Manufacturing Company, the bankrupt company, then known as the English Mining & Manufacturing Company, executed a warranty deed, dated September 12, 1902, whereby it conveyed to the Jackson Chemical Manufacturing Company, one hundred and seventeen acres of land and two lots in Cape Girardeau County, Mo., for an expressed consideration of $15,000. The deed just mentioned was acknowledged by English as president of the English Mining & Manufacturing Company, on September 18, 1902, and after being so acknowledged was left by English in the posession of one Limbaugh, the notary who took the acknowledgment, and remained in the possession of the notary for several months, and was then returned by the notary to English who placed it in his box in the vault of the Jackson Exchange Bank at Jackson, Mo., where it remained until July, 1906, when it was taken out and afterwards recorded under circumstances to be presently stated.

It further appears from the evidence that on September 12, 1902, the Jackson Chemical Manufacturing Company executed a deed of trust whereby it conveyed the 117 acres of land and the 2 lots here in question to one Henry L. Jones, as trustee, to secure the payment of 25 promissory notes for the sum of $500 each, executed by it and payable five years after date to the English Mining & Manufacturing Company. On December 4, 1902, the English Mining & Manufacturing Company borrowed $8,500 from the Sturdivant Bank and pledged with the bank as collateral security for the loan, the 25 notes of the Jackson Chemical Manufacturing Company above referred to. The evidence shows that in negotiating this loan the bankrupt company was represented by Henry R. English, who informed the bank that the notes were secured by a deed of trust upon certain lands formerly owned by the bankrupt company and that the bankrupt company had conveyed the lands to the Jackson Chemical Manufacturing Company by warranty deed, and that the notes were secured by a deed of trust upon the land executed by the Jackson Chemical Manufacturing Company.

It further appears from the evidence that at the time the loan was obtained from the Sturdivant Bank, Henry R. English forwarded to the bank by mail the deed of trust executed by the Jackson Chemical Manufacturing Company to secure the collateral notes and requested the bank to return the deed of trust to him and that he would record

it, and that the bank, on December 4, 1902, mailed the deed of trust to English and requested him to place it of record. The evidence further shows that the bankrupt company from time to time renewed the note evidencing the debt owing by it to the Sturdivant Bank and afterwards increased its debt to the bank by borrowing additional money so that in July, 1906, it was indebted to the bank in the sum of $15,000 for which the bank held as collateral security the twenty-five notes executed by the Jackson Chemical Manufacturing Company and secured by deed of trust before mentioned. The evidence shows that when the deed of trust executed by the Jackson Chemical Manufacturing Company was returned by the Sturdivant Bank to Henry R. English on December 4, 1902, that English did not file the deed for record, but placed it in his box in the vault of the Jackson Exchange Bank, and that it remained there until July, 1906, when it was taken out and afterwards placed of record under circumstances to be presently stated. Henry R. English testified that the reason he did not record the warranty deed from the bankrupt company to the Jackson Chemical & Manufacturing Company and the deed of trust from the Chemical Company to Jones, trustee, was that he was advised by his attorney not to do so, and that he thought the recording of the instrument might affect the interests of the Jackson Exchange Bank of which he was president, and that he was at the time negotiating with parties in St. Louis to secure money and expected to take up the loan in a short time.

The evidence further showed that in September, 1902, the bankrupt company executed a deed of trust whereby it conveyed to Henry R. English lots 154, 155, 167, and 168 in the city of Jackson, and also certain lands in Cape Girardeau county, including the plant used by it for the purpose of making brick and tile, to secure 25 notes of $500 each executed by the English Mining & Manufacturing Company to the order of Henry R. English, that on September 12, 1902, English obtained a loan of $8,500 from the Merchants-Laclede National Bank of St. Louis, giving the bank a note for that sum executed by him, and deposited with the bank as security for the $8,500 and the twenty-five notes of the English Mining & Manufacturing Company referred to above. It further appeared that this deed of trust was not recorded, but remained in the possession of English until about July 19, 1906, when he delivered it to his attorney, one W. H. Miller, under circumstances to be stated hereafter. It further appeared that about July 6, 1906, the bankrupt executed and delivered to one Hugh R. Quinn a note for about $27,000 to cover an indebtedness due Quinn by the bankrupt company, and to secure this note the bankrupt executed and delivered to Quinn a mortgage covering the entire property and plant of the bankrupt company and embracing substantially all the land described in the prior deeds of trust held by the Sturdivant Bank and the Merchants-Laclede National Bank.

The evidence further showed that in July, 1906, the bankrupt company had become heavily involved, was insolvent and unable to meet its obligations, and that English as president of the company placed the affairs of the company in the hands of his attorney, W. H. Miller, of

Jackson, Mo., and turned over to Miller the deed from the English Mining & Manufacturing Company to the Jackson Chemical Manufacturing Company, the deed of trust from the latter company to Jones, trustee, and also the deed of trust from the English Mining & Manufacturing Company to the trustee of Henry R. English, purporting to secure the notes held by the Merchants-Laclede National Bank. It further appeared that about July 19, 1906, W. H. Miller, as attorney for the bankrupt company, informed the Sturdivant Bank, the Merchants-Laclede National Bank and other creditors, that the company was in financial difficulties and unable to proceed with its business, that on or about that date Mr. Albert, president, and Mr. Oliver, attorney, of the Sturdivant Bank, Mr. Quinn, Mr. English, and Mr. Miller, had a conference in Jackson, Mo., in which the affairs of the bankrupt company were discussed. At this conference the president and attorney of the Sturdivant Bank learned that the deed from the English Mining & Manufacturing Company to the Jackson Chemical Manufacturing Company, and the deed of trust from the Jackson Chemical Manufacturing Company to Jones, trustee, had never been recorded, and also learned of the existence of the Quinn mortgage, and of the prior deed of trust purporting to secure the notes held by the Merchants-Laclede National Bank. The evidence tends to show that Mr. Quinn first learned at this conference of the existence of the deed of trust from the English Mining & Manufacturing Company to the Jackson Chemical Manufacturing Company, of the deed of trust executed by the latter company purporting to secure the notes held by the Sturdivant Bank, and of the deed of trust executed by the English Mining & Manufacturing Company purporting to secure the notes held by the Merchants-Laclede National Bank. The evidence showed that the president of the Sturdivant Bank and all of the persons present at this conference were informed of the financial condition of the bankrupt company, and of the fact that the company owed about $69,000 and was insolvent. It further appears that after this meeting an endeavor was made to secure the consent of the creditors of the bankrupt to turn over its property to trustees with a view to carrying on the business for the benefit of the creditors, but that this arrangement was not perfected because of the objections of certain creditors. It further appears that on August 8, 1906, Hugh R. Quinn placed the mortgage given him by the bankrupt company of record, and that immediately thereafter and on the same day Mr. Miller, attorney for the bankrupt company, filed for record the deed from the English Mining & Manufacturing Company to the Jackson Chemical Manufacturing Company, the deed of trust of the Jackson Chemical Manufacturing Company to Jones, trustee, and the deed of trust of the bankrupt company securing the notes held by the Merchants-Laclede National Bank. It further appears that on August 9, 1906, the Sturdivant Bank filed a suit against the bankrupt company upon the note of the company held by it, in the Cape Girardeau Court of Common Pleas, and caused a writ of attachment to be issued and levied upon the property of the bankrupt, and on September 27, 1906, secured judgment against the bankrupt by default in the sum of $15,410, and also a judgment sustaining the

attachment; and that afterwards, on March 9, 1907, the court, upon the application of Joseph E. Schmuke, trustee of the bankrupt estate, made an order directing the sheriff to turn over to the trustee all of the property attached, together with the cash in his hands, and to return the execution previously issued in the cause unsatisfied and without prejudice to the plaintiff.

It further appeared from the evidence that a petition in involuntary bankruptcy was filed by creditors against the bankrupt on October 8, 1906, and resulted in an adjudication of bankruptcy on October 31, 1908. The evidence showed that in July, 1906, and thereafter, up to the time of its bankruptcy, the bankrupt company owed debts amounting to $69,959; that upwards of $25,000 of this indebtedness arose after the Sturdivant Bank had received the collateral notes delivered to it by the bankrupt in December, 1902; that between December 4, 1902, and July 19, 1906, the Bank of Whitewater had loaned the bankrupt about $2,600, and before making the loan had caused the title to bankrupt's real estate to be examined and had found no incumbrances thereon of record. It further appeared that in June, 1906, Hugh R. Quinn had made a loan to bankrupt company of about $27,000, and received from the bankrupt as security for the loan a deed of trust covering all the bankrupt's property including that embraced in the deed of trust to the claimant bank, and before loaning the money that Quinn had examined the records and found that no incumbrances were of record affecting the bankrupt's real estate. Quinn testified that at the time he received his mortgage he had no knowledge of the deed of trust given the claimant bank. The evidence makes it clear that Henry R. English, the president of the bankrupt company, withheld the various conveyances heretofore mentioned from record in order that the bankrupt might obtain credit upon its apparent ownership of the property described in such conveyances.

[1] It is contended by the claimant bank that the referee has no jurisdiction to summarily determine the validity of its lien upon the land described in the deed of trust from the Jackson Chemical Manufacturing Company to Jones, trustee, and that the validity of such lien can only be adjudicated in a plenary suit. But the evidence shows that the land described in this deed of trust is in the possession of the trustee of the bankrupt estate, and it further appears that the claimant bank voluntarily appeared before the referee in bankruptcy and presented its claim for allowance as a secured claim, alleging that it had a lien upon the land by virtue of the deed of trust, and under these circumstances there can be no question that the referee had jurisdiction to determine the validity of the lien asserted, and to adjudge whether or not the claim should be allowed as a secured one. Chauncey v. Dyke Bros., 9 Am. Bankr. Rep. 444, 119 Fed. 1, 55 C. C. A. 579; In re Rochford, 10 Am. Bankr. Rep. 608, 124 Fed. 182, 59 C. C. A. 388; In re Granite City Bank, 14 Am. Bankr. Rep. 404, 137 Fed. 818, 70 C. C. A. 316; In re Schermerhorn, 16 Am. Bankr. Rep. 508, 145 Fed. 341, 76 C. C. A. 215; In re McMahon, 17 Am. Bankr. Rep. 531, 147 Fed. 684, 77 C. C. A. 668; In re Dana, 21 Am. Bankr. Rep. 683, 167 Fed. 529, 93 C. C. A. 238; Thomas v. Woods, 23 Am.

Bankr. Rep. 132, 173 Fed. 585, 97 C. C. A. 535, 26 L. R. A. (N. S.) 1180; Mound Mines Company v. Hawthorn, 23 Am. Bankr. Rep. 242, 173 Fed. 882, 97 C. C. A. 394; Whitney v. Wenman, 198 U. S. 539, 25 Sup. Ct. 778, 49 L. Ed. 1157. Under the facts disclosed in the evidence there can be no question that the debt due from the bankrupt to the claimant bank is a bona fide debt and that the bank gave a present consideration for the collateral notes secured by the deed of trust from the Jackson Chemical Manufacturing Company to Jones, trustee. The case, therefore, presents no question of positive fraud on the part of the bank, and if the bank's lien upon the property described in the deed of trust is to be held invalid as against the trustee in bankruptcy, it must be because the deeds are to be treated as inoperative by reason of the delay in recording them or for constructive fraud or for some other reason.

[2] The referee in bankruptcy held that the deed from the bankrupt company to the Jackson Chemical Company was never delivered and that, therefore, the title to the property here in question never passed from the former to the latter company. But in my opinion the evidence does not warrant this conclusion, and I feel constrained to find that there was sufficient delivery of the deed to pass the title from the grantor to the grantee company. The evidence shows that English was the president of both the English Mining & Manufacturing Company and the Jackson Chemical Manufacturing Company, and that he was in control of the affairs of both companies. It also appears that the deed from the English Mining & Manufacturing Company to the Jackson Chemical Company, and the deed of trust from the Jackson Chemical Company to Jones, trustee, were executed on behalf of the respective grantors by English as president, and that they were acknowledged on behalf of said grantors respectively by English as president on September 16, 1902, and that after being executed and acknowledged, both deeds were left for a time in the hands of the notary who took the acknowledgments, and were afterwards placed by English in his box at the Jackson Exchange Bank where he kept papers belonging to himself and his companies. It appears that later on, in December, 1902, when English negotiated the loan from the claimant bank, he forwarded the deed of trust by mail to the bank and suggested that the bank return the deed of trust to him to be recorded. The bank afterwards returned the deed of trust to English, requesting him to record it. It thus appears that English as president of English Mining & Manufacturing Company executed and acknowledged the deed whereby the company conveyed the land to the Jackson Chemical Company, and on the same day English, as president of the Jackson Chemical Company executed and acknowledged a deed of trust whereby the latter company conveyed the property to a trustee, purporting to secure the purchase price and shortly thereafter English, as President of the English Mining & Manufacturing Company, pledged the notes secured by the deed of trust with the claimant bank to secure a present loan. Under the facts here disclosed, I am of opinion that the deed from the bankrupt company to the Jackson Chemical Manufacturing Company must be regarded as having been delivered prior to the time the deed of trust was forwarded by English

to the bank. What acts are sufficient to constitute delivery of a deed is largely a question of intention, and in the present case it appears that both the grantor and the grantee corporations treated the deed as duly delivered, and the grantee executed a deed of trust upon the property for the benefit of the grantor, and the grantor in turn pledged the notes secured by the deed of trust as collateral for a loan made by it by a third party, and under these circumstances the deed must be regarded as having been delivered so as to pass the title from the grantor to the grantee. Stevens v. Hatch, 6 Minn. 64 (Gil. 19); Wall v. Wall, 30 Miss. 91, 64 Am. Dec. 147; Farrar v. Bridges, 5 Humph. (Tenn.) 411, 42 Am. Dec. 439; Bunnell v. Bunnell, 111 Ky. 566, 64 S. W. 420, 65 S. W. 607; Devlin on Deeds (2d Ed.) § 262.

[3] In reaching the conclusion that the claimant bank did not acquire a valid lien under the deed of trust, the referee seems to have held that the Jackson Chemical Manufacturing Company was not legally incorporated, or that by reason of irregularities attending its incorporation, the company did not become a corporation de jure such as could acquire and convey title to the real estate here in question.

[4] The evidence, however, shows that the incorporators of this company took all the formal steps required by the statute to entitle it to a certificate of incorporation, and that a certificate in due form was issued by the Secretary of State, and, although the evidence seems to show that the company had no bona fide stockholders, and that no part of its capital stock was ever paid in, it seems to admit of no doubt that the company was at least a de facto corporation, and it is well settled that the transfer of property by or to a de facto corporation cannot be collaterally attacked and will be held valid against all persons except the state. Finch v. Ullman, 105 Mo. 255, loc. cit. 263, 16 S. W. 863, 24 Am. St. Rep. 383.

[5] In support of the order made by the referee it is further contended that the deed of trust is invalid because it constitutes a voidable preference under section 60, pars. "a" and "b" of the bankrupt act as amended. This contention is based primarily upon the amendment to section 60, paragraph "a," contained in the act of February 5, 1903, which provides, that:

"Where the preference consists of a transfer such period of four months shall not expire until four months after the date of the recording or registering of the transfer, if by law such recording or registering is required."

It is to be noticed that the deed of trust here in question was executed in September, 1902, and that the notes secured thereby were delivered to the bank for a present loan on December 4, 1902; but that the deed was not recorded until August 8, 1906, within four months of the filing of the petition in bankruptcy. The transfer of title effected by the deed of trust was made prior to the enactment of the amendatory act of February 5, 1903, and it is open to doubt whether the amendment to section 60a contained in that act can be given retrospective effect so as to render it applicable to this transaction. But even if it is to be assumed that the amendment of 1903 is applicable to the transfer here in question, it still seems clear that the transaction cannot properly be treated as a voidable preference be-

cause the deed of trust was given to the bank as security for a present loan, and not for an antecedent indebtedness. In re Union Feather & Wool Mfg. Co., 7 Am. Bankr. Rep. 472, 112 Fed. 774, 50 C. C. A. 524; City Bank v. Bruce, 6 Am. Bankr. Rep. 311, 109 Fed. 69, 48 C. C. A. 236; Stedman v. Bank, 9 Am. Bankr. Rep. 4, 117 Fed. 237, 54 C. C. A. 269; Farmers' Bank v. Carr, 11 Am. Bankr. Rep. 733, 127 Fed. 690, 62 C. C. A. 446.

The provision of the statute that "where the preference consists in a transfer, such period of four months shall not expire until four months after the recording or registering of the transfer, if, by law, such recording or registering is required, was intended to postpone the time within which a transfer is open to attack as a preference until four months after the date of the recording of the transfer, where such recording is required by the local law; but while the statute postpones the time within which the transfer can be attacked the statute cannot properly be so applied as to materially alter the essential character of the transaction. If the transfer is one which is required to be recorded, the four-month period during which it may be attacked does not begin to run until the conveyance is recorded, but if the transfer when made was based upon a present consideration, a delay in recording the instrument does not warrant us in treating the conveyance as if it were made as security for an antecedent debt, because to do so would be to create by construction a transaction different from the actual one. It is true that in certain cases where the conveyance has no force and validity whatever as to creditors until recorded, the courts have held that the transfer may be regarded as first coming into existence when it is recorded (McElvain v. Hardesty, 22 Am. Bankr. Rep. 320, 169 Fed. 31; In re Newton, 18 Am. Bankr. Rep. 567, 153 Fed. 841, 83 C. C. A. 23; Bank v. Connett, 15 Am. Bankr. Rep. 662, 142 Fed. 33, 73 C. C. A. 219, 5 L. R. A. [N. S.] 148); but in my opinion these cases are inapplicable to the facts here presented, and, as the transfer here in question was for a present consideration, it cannot properly be treated as a voidable preference.

[6] The principal contention made on behalf of the trustee in bankruptcy is that the deed of trust must be held invalid against the trustee because they were withheld from record from September, 1902, to August 8, 1906, and during this period the bankrupt remained in possession of the property, continued to carry on its business, and obtained credit to the extent of more than $25,000 from various persons whose claims are now unpaid, and who, in extending credit, relied upon the bankrupt's apparent ownership of the property. In support of this contention the trustee relies upon the provisions of sections 67a, 67e, and 70e of the act. These sections of the statute confer upon trustees in bankruptcy the right to avoid transfers, incumbrances, or liens which are voidable as fraudulent conveyances, or which might be avoided by creditors under the state law for want of record, or other reasons. In respect of the present contention we are thus remitted to the state law and the validity of the deed of trust here in question is to be determined by reference to that law. Section 925 of the Revised Statutes of Missouri 1899, referring to instruments

conveying real estate, or whereby any real estate may be affected in law or in equity, provides that:

"No such instrument in writing shall be valid, except between the parties thereto and such as have actual notice thereof, until the same shall be deposited with the recorder for record."

This statute, although broad and comprehensive, in its terms, has been so construed as to have little effect, the general doctrine laid down in Missouri cases being that an unrecorded conveyance of real estate is good, except to bona fide purchasers or incumbrances for value and without notice. Cape Girardeau Road Co. v. Renfroe, 58 Mo. 265; Bank v. Rohrer, 138 Mo. 370, 39 S. W. 1047; Hord v. Harlin, 143 Mo. 469, 45 S. W. 274.

But it is well-established law in Missouri that a conveyance of real estate may, under certain circumstances, be held constructively fraudulent or inoperative as to creditors because of its being withheld from record. In Goldsby v. Johnson, 82 Mo. 602, loc. cit. 606, the Supreme Court, speaking through Judge Norton, said:

"It seems to be an established principle that a deed not at first fraudulent may become so by long being concealed, because by its concealment, persons may be induced to give credit to the grantor. In such cases the use that is made of it relates back and shows the intent with which it was made. The omission to place the deed on record or leaving it in the hands of the grantor, or placing it in the hands of a third person to be produced or suppressed as exigencies may demand, are instances of delay that are within the rule."

In Central National Bank v. Doran, 109 Mo. 40, loc. cit. 49, 18 S. W. 838, it was held that where one indebted to a bank executed a deed of trust on his land with the understanding that it was to be withheld from record so as not to impair his credit, and another bank, relying upon the indicia of solvency thus created, extended credit to the debtor after execution of the deed of trust and before it was recorded, that the deed would be treated as constructively fraudulent as to the creditor so extending credit although there was no actual intent to defraud. In its opinion in this case the court said:

"The authorities cited by the plaintiff bank fully bear out the position that in circumstances similar to those related, a court of equity will postpone or set aside as fraudulent an instrument whose recording has been clandestinely delayed as aforesaid. And, apart from any agreement of the sort mentioned, some of the authorities hold that where a deed is concealed from the public, at least for a considerable length of time, while the record-owner remains in possession and is given a suppositious credit thereby, which results detrimentally to others who rely upon the outward indicia of solvency thus created, such deed will be declared constructively fraudulent, though no actual intent to defraud exists."

In Bank v. Buck, 123 Mo. 141, 27 S. W. 341, it appeared that a bank had taken two deeds from a customer as security for his indebtedness and withheld them from record for two and three years, respectively, and did not place them of record until the day the grantor failed in business. While the deeds were so withheld from record, the grantor continued in business and incurred various debts. There was no agreement that the deeds should be withheld from record for any definite time, but the court concluded from the evidence that there

was an understanding between the parties that the deeds should not be recorded until the bank regarded it as necessary for its protection to place them of record. The court in its opinion quotes with approval the language used in Hungerford v. Earle, 2 Vern. 261, that "a deed not at first fraudulent may afterwards become so by being concealed, or not pursued, by which means creditors are drawn in to lend their money"; and applying the principle that "every man is presumed to intend the necessary consequences of his act, and if an act necessarily delays, hinders, or defrauds creditors, then the law presumes it was done with a fraudulent intent," adjudged that the deeds were fraudulent and void as to the grantor's creditors. The same doctrine is laid down in case of Singer Manufacturing Co. v. Stephens, 169 Mo. 1, loc. cit. 10, 68 S. W. 903, 905, where the court said:

"The essential facts authorizing the decree entered herein by the trial court * * * are these: That although the appellant was found to have been the real owner of the land in controversy prior to the creation of the debt of plaintiff's assignor, and although she was found to have accepted the deed to the land at the time it was made in good faith and without the contemplation of a fraud upon the rights of any one, the court found that while she was the real owner of the land, she suffered the record title thereof to be and remain in her codefendant Charles Clifton, whereby he, on the strength of his apparent ownership of same induced the plaintiff's assignor to extend to him a credit which otherwise would have been denied. The mere recital by the court in its finding of facts 'that the conveyance of the land to the defendant Isabel Stephens was made and accepted by her in good faith and without fraud on her part' is no impeachment of the correctness or the validity of the decree subjecting appellant's land to the claim of a creditor of the apparent owner of the land, prior to the time appellant was invested with the legal title thereto in November, 1894. It was not necessary that the defendant Isabel Stephens should actually have known that her codefendant Clifton was obtaining credits from the plaintiff's assignor on the faith of his apparent ownership of the land in controversy which stood of record in his name, or that she did in fact know that credit had actually been extended to Clifton's creditor on the faith of his apparent ownership of the land, prior to the time the conveyance of the land was made to her. Actual knowledge of either of those conditions on part of appellant would have amounted to a positive fraud against plaintiff, and of this the court's finding of facts shows she was not guilty; but the decree entered was predicated upon the fact not that an intentional fraud was committed by appellant upon the plaintiff, but that a wrong had resulted to plaintiff by means of the conduct of appellant in so managing her property that plaintiff was induced to give to another on the strength of his apparent ownership of it a credit which otherwise would have been denied."

The facts in this case, in my opinion, bring it within the doctrine announced in the cases just referred to and constrain me to treat the deed of trust as constructively fraudulent and unenforceable as against the trustee in bankruptcy. The evidence in this case shows that the claimant bank exercised little care or vigilance for its own protection, but relied implicitly on English. At the time the deed of trust was delivered to the bank in December, 1902, the record title to the property was in the bankrupt company and not in the Jackson Chemical Manufacturing Company, the grantor in the deed of trust. The bank made no investigation into the state of the record title, but simply accepted the statement of English that the Jackson Chemical Company had a warranty deed to the property and

made no inquiry as to the whereabouts of the deed or whether or not it had been placed of record. The bank, after making the loan, returned the deed of trust to English on December 4, 1902, and English was permitted to remain in possession of both deeds for nearly four years without any inquiry upon the part of the bank as to the state of the title or as to the disposition made by him of the deeds. The evidence shows that the bank had knowledge of the fact that the bankrupt company was actively carrying on its business during this period, and as reasonable men they were bound to infer that the company was seeking and obtaining credit from at least some of those with whom it had business relations. The evidence makes it clear that English willfully withheld both deeds from record for the purpose of securing for the bankrupt company such credit as would result from its apparent unincumbered ownership of the property, and the evidence also conclusively shows that the company availed itself of this fictitious credit, and after December, 1902, contracted debts amounting to upwards of $25,000, and that this indebtedness remains unpaid, and that the creditors extending the credit relied upon the company's ownership of this property, and, indeed, that one creditor, Mr. Quinn, was subsequently given a mortgage by the bankrupt upon the same property embraced in the bank's deed of trust. The evidence constrains me to conclude that English, during this entire period, was pursuing a deliberate policy of raising money by mortgages upon the bankrupt's property and then retaining possession of the mortgages and suppressing them so that the company's credit might remain unimpaired. The evidence shows that English, by means of the execution and suppression of the various mortgages and deeds of trust, including the deeds here in question, has grossly imposed upon those who have dealt with the company and perpetrated a series of frauds upon the company's creditors, and it is apparent that English was enabled to practice these frauds because of the blind confidence of the mortgage creditors, who, without taking any care to safeguard their own interests or to protect others, placed their mortgages in his custody and allowed them to remain in his possession for years without any inquiry as to the disposition of them by him until they learned of the bankrupt's failure in business. It is conceded that the bank made English its agent for the purpose of recording the deed of trust, but it is contended that the fraudulent purpose of English in failing to record the deed, cannot properly be imputed to the bank, because in suppressing the deed, English violated his instructions and was pursuing a course hostile to the bank and in the interest of the bankrupt company only. I think it is clear that the bank should not be charged with the positive fraud of English, but there can be little question that the failure of the bank's agent to record the deed must be given precisely the same legal effect and must entail the same legal consequences as if the bank itself had withheld the deed from record during the period it remained in the custody of English.

It is, however, contended on behalf of the bank that in Missouri a deed cannot in any case be treated as fraudulent or inoperative as

to creditors because of failure to record it, unless it is withheld from record pursuant to an agreement between the parties. But a careful examination of the reported cases has led me to conclude that an agreement to withhold the deed from record is not, under all circumstances, necessary in order that the court may be justified in setting aside the deed as constructively fraudulent where the grantor has been permitted to continue in possession of the land, has to the knowledge of the grantee been carrying on his business, and has secured credit from persons who have dealt with him in reliance upon his apparent title. The real vice of withholding a deed from record results from the fact that knowledge of the conveyance is thereby withheld from the public, and persons are induced to give the grantor credit in reliance upon his ostensible ownership of the property; and the injury inflicted upon creditors is precisely the same whether the conveyance be withheld from record as the result of an agreement between the parties, or because of the grantee's negligent or willful failure to record it, and the detrimental effect which will probably result can be as well foreseen by the grantee in one case as in the other. It is of course well settled in Missouri that the mere withholding of a deed from record, even if it be so withheld by agreement of the parties, will not render it voidable at the instance of creditors where the evidence does not affirmatively show that the complaining creditors were induced to give credit to the grantor in reliance upon his apparent ownership of the property. Bank v. Roher, 138 Mo. 369, 38 S. W. 1047; Bank v. Newkirk, 144 Mo. 472, 46 S. W. 606; Wall v. Beedy, 161 Mo. 625, 61 S. W. 864. The strongest case tending to support the validity of the bank's lien as here asserted is the case of Hord v. Harlan, 143 Mo. 469, 45 S. W. 274, where the absence of any agreement to withhold the deed from record is treated as a controlling circumstance, justifying the court in upholding the deed; but even in this case the court lays emphasis upon the fact that there were no circumstances in evidence tending to bring home to the grantee knowledge that the grantor was obtaining credit upon the faith of his apparent ownership of the land. In the still later case of Clark v. Lewis, 215 Mo. 173, loc. cit. 187, 114 S. W. 604, 608, the court discusses the effect of withholding a deed from record and says that, "The mere withholding a deed to, or mortgage upon, land from record will not, ipso facto, vitiate the instrument. It is only when the withholding the instrument from record gives the grantor, upon the faith of the ownership by him of the property conveyed, a fictitious credit, and some one has thereby been misled to his injury, that such failure to record will be held to be fraudulent." Independently of the question of constructive fraud, I am of opinion that the lien of the bank should be treated as invalid as against the trustee as the representative of the bankrupt's creditors upon the equitable principle laid down in Singer Mfg. Co. v. Stephens, 169 Mo. 1, 68 S. W. 903. The bank must be charged by virtue of the recording laws, with knowledge of the fact that the title to the property in question stood from December 4, 1902, to August 8, 1906, in the bankrupt company, and in negligently permitting the title to stand in the bankrupt company during this.

period, a wrong has resulted to the creditors of bankrupt who have thereby been induced to give bankrupt a credit which would not otherwise have been bestowed.

Upon a careful consideration of the facts disclosed in the evidence and of the law applicable thereto as laid down in the Missouri cases, I have reached the conclusion that the deed of trust held by the bank should be treated as constructively fraudulent or inoperative as to those creditors who extended credit to the bankrupt subsequent to December 1902, and as the amount of these debts considerably exceeds the value of the property embraced in the deed, the lien here asserted cannot be sustained. In my opinion the referee's order was justified by the evidence, and it will be affirmed.